# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **FEDERAL TRADE COMMISSION** ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Misc. No. 1:10-mc-00289 (CKK)(AK) |
| ) | |
| **PAUL M. BISARO**, ) | |
| ) | |
| Respondent. ) | |

## PETITIONER FTC'S MOTION FOR LEAVE TO SUPPLEMENT THE RECORD AND TO ENFORCE THE SUBPOENA *AD TESTIFICANDUM* FORTHWITH, AND MEMORANDUM IN SUPPORT

On July 13, 2010, this Court entered a Memorandum and Order finding that Respondent had made a "colorable claim" that the Federal Trade Commission ("FTC" or "Commission") had engaged in misconduct by seeking Respondent's oral sworn testimony in a law enforcement investigation issued pursuant to a resolution approved by the full Commission. Contrary to Respondent's assertions, the Commission's actions were carried out for legitimate law enforcement purposes in furtherance of the public interest – and, in one critical instance, with the consent of Respondent's counsel. Accordingly, we submit this Motion to Supplement the Record in order to provide the Court with a more complete factual background, and to ensure that this evidence is available on the public record and not just to Respondent. The Commission also moves this Court to enforce its Subpoena *Ad Testificandum* forthwith, as there is no remaining cause for delay.

For the reasons set forth below, we seek to supplement the record with (i) answers to Respondent's two interrogatories sworn to by Markus H. Meier, chief of the Health Care Division ("Interrog. Resp." attached as Exhibit A,); (ii) a Declaration by Richard A. Feinstein, Director of the Commission's Bureau of Competition and former chief of the Bureau's Health Care Division ("Feinstein Decl." attached as Exhibit B); and (iii) a Declaration by Saralisa C. Brau, Deputy Assistant Director of the Bureau's Health Care Division and the person responsible for day-to-day management of the investigation into potential anticompetitive conduct of Watson Pharmaceuticals, Inc. ("Watson") ("Brau Decl." attached as Exhibit C). Because the factual record amply demonstrates that the requirements for judicial enforcement have been satisfied, and for the reasons set forth in more detail below, the FTC also respectfully moves this Court to take all steps necessary to further the enforcement of the July 22, 2009, subpoena *ad testificandum* forthwith.

## PRELIMINARY STATEMENT

The FTC acted appropriately at all times during the course of this investigation. Further, Respondent has made no objective "showing" of misconduct, and the "extraordinary circumstances" that might justify discovery within the context of summary subpoena enforcement proceedings are not present here. *Federal Trade Commission v. Carter*, 636 F.2d 781, 789 (D.C. Cir. 1980). The Commission takes this opportunity to provide the Court with the full story. The proposed submissions – the FTC's Responses to Interrogatories, the Feinstein Declaration, and the Brau Declaration – demonstrate that: the law enforcement investigation giving rise to the subpoena at issue has been conducted in a proper and lawful manner that is fully consistent with the ordinary course of Commission practice; that the Commission did not try to broker any deal

between Watson and Apotex; that Watson's interactions with Apotex are directly relevant to determine whether Watson is bound by an agreement not to relinquish any potential exclusivity rights; that there were no improper disclosures of confidential information made at any time during the course of the investigation; and, finally, that Respondent has impeded an ongoing Commission investigation, potentially causing harm to the public interest.

As detailed below, and elaborated in the papers already on file with this Court, the requirements for judicial enforcement of the subpoena at issue have been fully satisfied. The FTC therefore respectfully requests that this Court, with a complete record now in hand, expeditiously resolve this matter pursuant to Local Civil Rule 72.3 so that the subpoena can be enforced at the earliest possible date. Respondent should be ordered to fulfill his legal obligation to cooperate with the lawful Commission investigation by sitting for an investigational hearing.

## STATEMENT OF FACTS

The investigation giving rise to the subpoena in question, like all formal Commission investigations involving the use of compulsory process, required majority vote of the Commission. Feinstein Decl. at ¶ 3; 16 CFR § 2.7(a). On August 30, 2006, the Commission unanimously issued a Resolution authorizing the use of compulsory process in the present investigation.[1] The initial focus of the staff's investigation concerned a patent settlement agreement entered into between Cephalon, Inc. ("Cephalon") and various generic companies involving Cephalon's '516 patent. Interrog. Resp. at 3; Brau Decl. at ¶ 3; *see also* Dkt. No. 4 (Mem. of P. & A. in Supp. of Pet. of F.T.C. for an Order Enforcing Subpoena *Ad Testificandum*) at 4-5.

---

[1] Resolution Authorizing Use of Compulsory Process in a NonPublic Investigation, File No. 0610182 (August 30, 2006). Pet. Exh. 2 (Dkt. No. 3 at 10).

It was not until January 2009, that the staff first learned of a subsequently-filed Cephalon patent – the '346 Patent. Interrog. Resp. at 3-4; Brau Decl. at ¶ 4. The agency's discovery that this second patent had been filed gave rise to a series of questions regarding the impact that such a patent might have on the competitive conditions in the market for generic modafinil – including, specifically, whether this second patent might be used to block generic entry. Interrog. Resp. at 4. At this point, the question arose as to whether Watson might have exclusivity rights with respect to a generic version of modafinil relating to the '346 Patent; and whether Watson had agreed with Cephalon not to relinquish or pursue those rights in exchange for a payment from Cephalon to Watson. Interrog. Resp. at 4; Brau Decl. at ¶ 4. Such an agreement would likely be a *per se* antitrust violation. *See, infra*, at 8. Thus, the Commission's investigation regarding potential anticompetitive conduct that might arise with relationship to the '346 patent began in January 2009, before any contact with Watson's counsel.

In the ordinary course of pursuing the investigation, Commission staff talked to the Food and Drug Administration (FDA) and to Apotex, Inc. ("Apotex")[2] to gather information needed to advance the Commission's understanding of the '346 Patent and its effects on the marketing of modafinil and any generic version of that drug, and to discover whether there was any possible agreement between Watson and Cephalon concerning potential exclusivity rights held by Watson. Interrog. Resp. at 4, 7. That staff action was fully consistent with normal and customary

---

[2] As detailed in the Interrogatory Responses, Apotex was an "obvious choice" to consult because it had filed an ANDA for a generic version of modafinil and was blocked from entering by Cephalon's modafinil settlements, it was already selling generic modafinil in Canada, and its Vice President of Global Intellectual Property, Shashank Upadye, is a published expert in the field. Interrog. Resp. at 7.

4

procedure followed in the ordinary course of Commission investigations.  Feinstein Decl. at ¶ 10. At no time did staff improperly disclose any confidential information to the FDA, nor did staff improperly discuss any confidential FDA information with Watson or others.  Interrog. Resp. at 5, 11; Feinstein Decl. at ¶¶ 2, 14.

More specifically, issuance of the '346 patent represented a novel situation to staff, Interrog. Resp. at 4, and a potentially new impediment to generic entry in the modafinil market. To the extent generic manufacturers obtained first-filer rights on this patent, and had entered into unlawful agreements with respect to those rights, it might allow them to block entry by other companies seeking to enter with a low-cost generic version of modafinil, causing further anticompetitive harm to consumers.  Interrog. Resp. at 4; Brau Decl. at ¶ 4.  That harm might be avoided if a generic company decided to relinquish any claim of exclusivity rights it might have on the '346 patent.  But the FTC staff were concerned that Watson had lost the ability to do that. Indeed, Section 2.1 of the 2006 Settlement Agreement between Watson and Cephalon could be read to prohibit Watson from relinquishing any new exclusivity rights it might have obtained based on any filing with respect to the '346 patent.  *See* Brau Decl. at ¶ 6.

In March 2009, Mr. Meier, the chief of the Commission's Health Care Division in its Bureau of Competition, contacted counsel for Watson, to probe whether Watson was willing to relinquish any exclusivity rights it might have.  Interrog. Resp. at 9; Brau Decl. at ¶ 8.  The basis for this inquiry was staff's belief that relinquishment could provide Watson with a potential business opportunity and, at the same time, potentially save consumers of Provigil millions of dollars a year by facilitating entry of generic modafinil.  Brau Decl. at ¶ 7.  If Watson was not interested in relinquishing, *i.e.*, was foregoing a potentially profitable opportunity against its

economic self-interest, the Commission would likely need to investigate further to assess whether that decision was based on an unlawful agreement with Cephalon or some other reason. Interrog. Resp. at 10; Brau Decl. at ¶ 9. Through a series of hypothetical questions, Mr. Meier sought to determine whether Watson would be interested in entering into a profit-maximizing agreement that would entail Watson licensing, relinquishing, or otherwise sharing whatever first-filer rights it might have. Interrog. Resp. at 9. Before the conversation ended, *Watson's counsel authorized Mr. Meier to contact Apotex regarding a possible deal between Watson and Apotex. Id.*

Not only did Mr. Sunshine, Watson's counsel, expressly assent to Mr. Meier calling Apotex and inviting Apotex to contact Watson, Mr. Sunshine even identified Watson's General Counsel, Mr. Buchen, as the person Apotex should call. Interrog. Resp. at 9-10; Brau Decl. at ¶ 8.[3] Contrary to Respondent's allegations that the FTC was engaged in improper deal brokering, the Commission was providing Watson with an opportunity to disprove its reasonable suspicion – a suspicion based on language contained in the 2006 Settlement Agreement between Watson and Cephalon – that an illegal agreement to refuse to relinquish existed. Thus, with the express consent of Steven Sunshine, Mr. Meier and Ms. Brau thereafter contacted Apotex. Interrog. Resp. at 9-10. In that call, staff suggested that, if Apotex also thought any potential deal might be worth pursuing, it should contact Watson regarding a possible deal concerning generic modafinil. *Id.* At no time did staff improperly disclose any confidential Watson information to any third party, including Apotex. Interrog. Resp. at 5, 11; Feinstein Decl. at ¶¶ 2, 14.

---

[3] These facts are omitted from Mr. Sunshine's Declaration of July 30, 2009. Pet. Exh. 4 at 28-32.

Despite the opportunity presented to it, Watson declined to negotiate a deal to relinquish any exclusivity it may have, thereby leaving open the possibility that it had entered into an illegal agreement with Cephalon. The Commission continued to investigate whether Watson had agreed with Cephalon not to relinquish. Brau Decl. at ¶ 12

In short, notwithstanding efforts by the staff to determine whether such an agreement existed, Watson has, to this date, refused to give the Commission staff an unequivocal answer to one simple question: has Watson agreed with Cephalon not to relinquish any exclusivity rights that it might hold with respect to generic modafinil? Feinstein Decl. at ¶ 12; Brau Decl. at ¶¶ 14-19; *see also* Pet'rs Reply Mem. in Supp. of Pet. for an Order Enforcing Admin. Subpoena *Ad Testificandum* and Opp'n to Respondent's Mot. to Compel, at 2-7 [Dkt. No. 21]. The Commission seeks the sworn testimony of Mr. Bisaro for a proper purpose – to determine whether there has been anticompetitive collusion between Watson and Cephalon. Watson's potential exclusivity rights arising from the '346 patent, the written settlement agreement between Cephalon and Watson, Watson's actions vis-a-vis Apotex, and Watson's continued refusal to give unequivocal answers to critical questions throughout this investigation, all support an inference that Watson may have agreed with Cephalon not to relinquish any exclusivity rights it may have with respect to generic modafinil. Mr. Bisaro is the only Watson executive besides Watson's General Counsel, Mr. Buchen, who is likely to have knowledge of critical facts relevant to the Commission's investigation, including the critical question concerning whether Watson has an agreement with Cephalon prohibiting it from relinquishing any exclusivity rights. Mr. Buchen has declined to answer that question unequivocally, asserting the attorney-client privilege. Brau Decl. at ¶ 16; *see also* Dkt. No. 21, at 2-7.

## LEGAL ARGUMENT

Watson has yet to provide the Commission with a clear and unequivocal answer to the question of whether it has agreed with Cephalon not to relinquish any exclusivity rights to generic modafinil. This is a critical question with clear competitive implications. Agreements not to relinquish exclusivity might be a *per se* violation of the antitrust laws. *See In re Cardizem*, 332 F.3d 896, 907-08 (6th Cir. 2003) (finding an agreement not to relinquish exclusivity rights to be a *per se* violation of the antitrust laws).[4]

The Commission is authorized to ask this question pursuant to a valid Commission resolution. *Supra* note 1. The subpoena at issue has gone through the full agency process in being issued. The subpoena was issued by a Commissioner acting under delegated authority of the full Commission. Feinstein Decl. at. ¶¶ 4, 5; 16 C.F.R. § 2.7(a). Respondent petitioned to quash the subpoena, and his petition was rejected by FTC Commissioner Pamela Jones Harbour, pursuant to authority delegated by the full Commission. Feinstein Decl. at ¶ 5. Respondent then

---

[4] As the full Commission expressly noted in its Letter Opinion denying Petitioner's Motion to Quash the subpoena:
> Courts have expressed great skepticism of agreements in which a generic manufacturer who is eligible for the 180-day exclusivity agrees with the branded manufacturer not to relinquish or waive that exclusivity. *See, e.g. In re Ciprofloxacin*, 544 F.3d 1323, 1339 (Fed. Cir. 2008) (agreeing that "the only legitimate allegation by the plaintiffs was that the 180-day exclusivity period had been manipulated."); *In re Tamoxifen Citrate Antitrust Litig.*, 429 F.3d 370, 401 (2d Cir. 2005) ("[W]e think that an agreement to time the deployment of the exclusivity period to extend a patent monopoly power might well constitute anticompetitive action outside the scope of a valid patent."); *Andrx v. Elan*, 421 F.3d 1227, 1235 (11th Cir. 2005) (holding that delayed licensed plus putative agreement to refrain from ever marketing a generic barred any competitors from entering "would exceed the scope of exclusion intended by the '320 patent"); *FTC v. Cephalon, Inc.*, No. 2:08-cv-2141, mem. op. (E.D. Pa. Mar. 29, 2010) (declining to dismiss complaint alleging that agreement to settle patent litigation and affecting relinquishment of exclusivity rights is anticompetitive).

Pet. Exh. 7, at 2, n.1.

filed a petition for review, and the full Commission, by unanimous vote, rejected arguments and denied Respondent's Petition to Quash, a petition in which he raised largely the same arguments presented to this Court. Pet. Exh. 7; Feinstein Decl. at ¶ 5. The Commission now seeks to supplement the record in the interest of providing the full story to the Court and bringing this matter to a close.

In this case, as Respondent acknowledged in its Motion to Compel, "[t]he only question that needs to be resolved is factual – *i.e.*, what is the FTC's purpose in prosecuting the Subpoena." Dkt. No. 16, at 3. The Commission's answers to Respondent's Interrogatories and supplemental declarations show that the agency's purpose in prosecuting the Subpoena was proper. And, as the Commission's earlier briefing has demonstrated, and Respondent fails to adequately refute, all of the other requirements for prompt judicial enforcement have been satisfied.[5] With both sides of the story now in hand, and the resulting showing that the Commission has acted in accordance with the law and in pursuit of proper purpose, the FTC respectfully requests that the Court act swiftly to enforce the subpoena *ad testificandum*.

### I.    Fundamental Notions of Fairness Support Granting Leave To Supplement The Record.

Presently, the evidentiary record in this case relating to the misconduct issue consists almost entirely of one declaration submitted by Respondent's attorney that relies on qualifying words such as "indicated", "hypothetical scenarios", and "suggested" to insinuate misconduct in this case but that falls far short of stating any fact that would demonstrate actual misconduct by

---

[5] At the very least, any remaining questions are principally questions of law and can be decided based on the existing briefing; no further hearing is needed.

the FTC. Pet. Exh. 4, Sunshine Decl. at ¶¶ 15, 16, 22. Mr. Sunshine's characterization of events notwithstanding, the objective facts are themselves entirely consistent with good faith actions on the part of the Commission. The Commission had not previously adduced its own evidence, given its firmly-held position that any evidentiary response to Respondent's unsupported allegations was not needed, in light of this Circuit's governing precedent. *See FTC v. Carter*, 636 F.2d 781, 789 (D.C. Cir. 1980).[6] Because the Commission is a law enforcement agency that Congress has charged with protecting the public interest, the existence of even this tentative

---

[6] With respect, this Court applied the wrong legal standard in permitting discovery. Even if the Court is correct that the rule from *Carter* "cannot be squared" with *United States v. Powell*, 379 U.S. 48 (1964), Dkt. No. 31, at 9, *Carter* remains the governing law of the Circuit and must be applied. *Carter* was issued 16 years after *Powell* and the panel who decided *Carter* had the benefit of *Powell* in reaching its ruling (although the *Carter* decision does not expressly cite to *Powell*, it discusses *Donaldson v. United States*, 400 U.S. 517 (1971), a case which itself discusses *Powell*). Just as the courts of appeals leave to the Supreme Court "'the prerogative of overruling its ... decisions,'" *Rodgriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484 (1989), district judges, like panels of [the courts of appeals], are obligated to follow controlling circuit precedent until [the court of appeals] sitting en banc, or the Supreme Court, overrule it." *United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997). Under the governing legal standard of this Circuit, therefore, Respondent is not entitled to discovery.

And, even apart from this threshold legal error, the limited "facts" presented by Respondent do not rise to the objective level necessary to support the extraordinary remedy of discovery in the context of summary enforcement proceedings and *a fortiorari*, are insufficient to thwart the prompt enforcement of the subpoena to which the Commission is demonstrably entitled. Thus, in *United States v. Fensterwald*, the single instance in which this Circuit has found "extraordinary circumstances" sufficient to warrant discovery, the ruling was based on objective facts, that the court expressly recognized to be "matters of public record," demonstrating the likelihood that the taxpayer was inappropriately targeted for a special audit outside of the course of normal agency proceedings. 553 F.2d 231, 233 (D.C. Cir. 1977). In contrast, the record here is bereft of any objective indicia of bad faith. The only showing is Respondent's characterization that is based on an incomplete and suppositional accounting of events by counsel, where the underlying events are themselves fully consistent with a lawful investigation carried out in the ordinary course of business. In light of its overriding interests in setting the record straight and given the importance of securing prompt enforcement of the subpoena, the Commission has not presently raised objections to the Magistrate's ruling in this case. The Commission, however, preserves the right to advance these arguments in the future if necessary.

10

finding by the Court potentially damages the public's confidence in the work the agency does. It is therefore important that the Commission have the opportunity to complete the record in this case to make clear that the Commission has properly conducted itself in all respects in this matter.

Notably, in partially granting Respondent limited discovery in this matter, the Court has directed the Commission to answer two interrogatories and has allowed Respondent ten days after receiving the answers to supplement the record. The Court's Order does not provide the Commission with an opportunity to respond. Unless the Commission is given an opportunity to supplement the record now, this means that the only evidentiary materials before the Court when it ultimately decides this matter may be those provided by the party that has the greatest interest in undermining the Commission's integrity. Fundamental notions of fairness and due process dictate that the Court be fully informed when making its decision. The Court should therefore grant the Commission's motion to supplement the record.

## II.     The Record, As Fairly Supplemented, Is Sufficient to Order Enforcement of the Subpoena *Ad Testificandum* Forthwith

The standards for judicial enforcement of administrative investigative process have long been settled in this Circuit. "[T]he court's role in a proceeding to enforce an administrative subpoena is a strictly limited one." *FTC v. Texaco, Inc.*, 555 F.2d 862, 871-72 (D.C. Cir. 1977) (*en banc*) (*citing Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943); *accord, Oklahoma Press Publ'g Co. v. Walling*, 327 U.S. 186, 209 (1946); *United States v. Morton Salt Co.*, 338 U.S. 632, 643 (1950)). A district court must enforce agency process so long as the information sought is not "unduly burdensome" to produce (*Texaco*, 555 F.2d at 881), and is "reasonably relevant" (*id.* at 872-73 n.23 (quoting *Morton Salt*, 338 U.S. at 652), or, putting it

differently, "not plainly incompetent or irrelevant to any lawful purpose" of the agency.  *Texaco*, 555 F.2d at 872 (quoting *Endicott Johnson,* 317 U.S. at 509).  In making this determination, the agency's own appraisal of relevancy must be accepted so long as it is not "'obviously wrong.'"  *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1089 (D.C. Cir. 1992) (citing *Carter*, 636 F.2d at 787-88 (quoting *Texaco*, 555 F.2d at 877 n.32)).

   Respondent has previously argued that the "most important[]"of its reasons against enforcement of the subpoena is that enforcement would result in an abuse of this Court's process because "the FTC exceeded its statutory law-enforcement mission by seeking to broker a business deal between Watson and Apotex ... improperly using its privileged access to confidential information in the process, and apparently providing Watson's confidential information to Apotex."  Resp'ts Mem. in Opp'n, Dkt. No. 12, at 3.  As Respondent has also acknowledged, in his Motion to Compel, this argument turns on a factual question.  Dkt. No. 16, at 3.  The Court now has the evidence in hand necessary to resolve this factual question.  There is no record support that the FTC has exceeded its authority or otherwise acted improperly – beyond the insinuations contained within the declaration of Respondent's counsel.  And there is now ample evidence to the contrary.

   With the Commission's submissions now before the Court, the record demonstrates that the FTC's purpose in prosecuting the subpoena was legitimate.  The Commission seeks to ascertain whether or not Watson is party to any potentially anticompetitive agreement with Cephalon that would prohibit it from relinquishing potential exclusivity rights in the generic modafinil market.

The agency timely began to investigate any potential anticompetitive effects resulting from the filing of the '346 patent as soon as it first learned of the filing of the patent, *before* any conversations with Watson's counsel. Interrog. Resp. at 3; Brau Decl. at ¶ 4. There was, and continues to be, good reason for the agency to seek this information. *See Modern Home Institute, Inc. v. Hartford Acc. & Indem. Co.* 513 F.2d 102, 111 (2nd Cir. 1975) ("Actions against the apparent individual economic self-interest of the alleged conspirators may raise an inference of interdependent action."). Respondent remains one of only two people who can address the agency's concerns, Brau Decl. at ¶ 19, and of the two, as Watson's President and CEO, Mr. Bisaro is well positioned to testify as to whether any business arrangement to relinquish exclusivity rights is likely to be in Watson's economic self-interest. Brau Decl. at ¶ 19. As the full Commission noted in denying Mr. Bisaro's Petition to Quash the Subpoena: "While Watson has provided the Commission information relating to the '346 Patent, [Respondent] has not shown that his testimony will shed no light on matters that fall within the scope of the Commission's investigatory concerns. As a key executive of Watson, [Respondent's] testimony may well be useful in elaborating on the information or explaining relevant circumstances." Pet. Exh. 7 at 6.

Throughout the course of this investigation, Watson has done nothing to allay the Commission's concerns that it has reached an illegal anticompetitive agreement with Cephalon; indeed, its actions (and inactions) indicate that it has. It should not be forgotten that the motion to compel discovery represents another method for Respondent to use in impeding a legitimate law enforcement proceeding. Respondent continues to avoid answering a central question to the Commission's investigation – namely, whether Watson's settlement agreement with a rival

manufacturer, Cephalon, limits Watson's ability to relinquish any exclusivity rights it may have with respect to marketing of the drug modafinil.

The Commission has shown that an investigational hearing of Respondent is necessary, because, to date, none of the sworn testimony contains a definitive disavowal of the existence of an agreement between Watson and Cepahlon that would prevent Watson from relinquishing exclusivity. Respondent has failed to rebut the Commission's showing that the investigative hearing is necessary. Moreover, Respondent does not dispute that Watson has repeatedly failed to answer, under oath, critical questions about the settlement agreement; it does not dispute that Respondent knows relevant facts to the investigation; and it does not assert that the investigational hearing would be unduly burdensome.

In furtherance of the interests of judicial economy and the public interest, and for the reasons previously articulated to this Court, the FTC respectfully requests that the Court recommend that Mr. Bisaro be directed to comply in full with the subpoena *ad testificandum*.

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that this Court grant its Motion for Leave to Supplement the Record and Petition to Enforce the Subpoena Forthwith.

DAVID C. SHONKA
Principal Deputy General Counsel
(D.C. Bar No. 224576)

JOHN F. DALY
Deputy General Counsel for Litigation
(D.C. Bar No. 250217)

LESLIE RICE MELMAN
Assistant General Counsel for Litigation
(D.C. Bar No. 266783)

/s/ Michael D. Bergman
MICHAEL D. BERGMAN
(D.C. Bar No. 437994)
(202) 326-3184

RUTHANNE M. DEUTSCH
(D.C.. Bar No. 498091)
(202) 326-3677

Attorneys
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, D.C. 20580
Fax (202) 326-2477

<u>Statement of Compliance</u>

Pursuant to L.Cv. R. 7(m), on July 20, 2010, Petitioner's counsel conferred with counsel for Respondent regarding Petitioner's Motion for Leave to Supplement the Record, and counsel for Respondent opposes the motion. There is no obligation, under the local rules, to confer with respect to Petitioner's dispositive motion to Enforce the Subpoena *Ad Testificandum* Forthwith.

/s/ Michael D. Bergman
Michael D. Bergman
Attorney
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, D.C. 20580
(202) 326-3184
Fax (202) 326-2477
mbergman@ftc.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2010, a true and correct copy of the foregoing Motion for Leave to Supplement the Record and to Enforce the Subpoena *Ad Testificandum* Forthwith, together with: Exhibit A: FTC's Responses to First Set of Interrogatories of Respondent Paul M. Bisaro sworn to by Markus H. Meier; Exhibit B: Declaration of Richard A. Feinstein; Exhibit C: Declaration of Saralisa C. Brau; and a Proposed Order, were filed electronically in the United State District Court for the District of Columbia using the CM/ECF system.

Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

Dated: July 22, 2010

/s/ Michael D. Bergman
Michael D. Bergman
Attorney for the Petitioner
Federal Trade Commission